The next case scheduled for oral argument is In Matter of St. Clair Co. v. IL Dept. of Revenue. Counsel, whenever you're ready, you may proceed. Good afternoon, Your Honors. Thank you. My name is Mike Winn. I'm representing Scott Air Force Base Properties, LLC. The appellant in this case, at 9th April, is the Co-Counsel, Gary Reuter, firm of Greenfield & Co. Galen Delta. This case is before you on administrative review, but decision of the Illinois Department of Revenue, which was in favor of Scott Air Force Base, LLC, concluding that the agreement that Scott Air Force, Scott LLC, as I'll refer to it, You have to speak up a little bit. They're recording. Certainly, concluding that the agreement that Scott LLC had with the Air Force, which was to demolish, renovate, build, and manage and operate military housing within the guarded perimeter of Scott Air Force Base, gave it a contractual license for a 50-year period rather than an accessible or taxable leasehold. There's three points we'd like to emphasize today, the last of which I may get during rebuttal. First of all, the Department's approach to the issue of whether or not something is a lease or a license is consistent with over 100 years of case law in this state that looks to the legal effect of the agreement, the conduct of the parties before and after the agreement, rather than to the terms they have, the names that they have given to the agreement themselves. So if they label it a lease or a license, it's not determinative at all. And there's decisions on both sides where a license isn't held to be a lease, and if something is called a lease, it's held to be a license. So the Department's approach was consistent with the Fadden Law, which is the law in the Supreme Court, from the 1800s to the Millennium Composition in 2010. The second, which we'll go into more detail in a minute, is that the findings of fact of the Department were specifically supported by specific evidence in the record, not general conclusions. They identified the documents and the testimony that supported each of the 36 specific numbered findings of fact. And although the county may disagree with the ultimate conclusion, there is not a single finding of fact that they've challenged as being unsupported by the evidence. So in terms of the standard review, the Department not only applied the right legal test, but it also made the necessary findings of fact to support its application in law. The third point, which we'll make it through in rebuttal, is that the county's burden to overturn the Department's decision in this case is to leave you with the impression that there was clear error, because this was a mixed question of fact and law. The facts were disputed, there was an evidentiary hearing held for two days, there were findings of fact that were made and inferences brought from the evidence, but they have to leave you with the impression that a clear mistake was made. And we think that's going to be very hard to do, given that there's been courts in other states that have looked at similar projects under the Military Housing Privatization Initiative, which I'll refer to as MHPI, which have concluded, just like the Department did, that the United States government, when it entered into those agreements, retained so much possession and control that it didn't really diminish its ownership of the property and it helped basically confer a license rather than, at least to these individuals, or to these companies. So let me go into two facets. First, the financial control, the Air Force exercise, and also the physical control, because you hear a lot about physical control in the breach of the parties over the facility, but the financial control is key. In the latest case from the Olin Supreme Court, Millennium Park, the court, at the very end, concludes that the agreement under review there was closer, resembled the agreements in Roswell rather than the service agreements in Stevenson. It was referring there to two cases, which are the application of Roswell, the 1979 Olin First District case, which concluded that the agreement between the city of Chicago and a private party for operation of a parking garage was not a lease but was instead a license. And the Stevens case, which is also a First District case, represented the other end of the spectrum, where an agreement that said it was a license, nevertheless, was concluded to be a lease, and this was an agreement that involved the operation of a McDonald's restaurant within the confines of a college. So when we hold up this case against those two markers that the Supreme Court has set out for us, you will see that the department was correct to conclude that this agreement, that it was closer to the agreement in Roswell, which was a license, than the agreement in Stevens, which was held to be a lease. In Roswell, there was plenty of evidence about the control, the physical control, about who could park, who could park where, where could you tow cars, what were the hours of operation, and so forth. But the key thing that was distinguishing in Roswell is that all the gross revenues from that operation went to the city, and the city then paid out to the operator of the parking facility a management fee. And that management fee was about 4% of the gross revenues of the facility as compensation. And so the court there said, well, it didn't screw this agreement to be a lease. That means that they're paying 96% rent, and that is unreasonable. That is the indication that the parties did not intend to create a lease. They intended instead to create a license. And so that was a key determinant in the application of Roswell. Here, when you look at the documents in this case, and there's numerous documents, but they're all related to each other, all the project revenues from the operation of the housing go into a lockbox account governed by a lockbox agreement. No disbursements are made from that account without the Air Force approving the disbursements. And there is a management fee that is paid to Scott LLC for its management of the housing that it constructed and renovated. And if you look at the record, we have the management agreement at the record at page 1149. It was our exhibit 14 at trial. And at 1153 of the record, it has section 5, which says the management fee is 3% of operating income plus 1.5% of operating income, which is an incentive management fee. In order to earn that 1.5%, and we had testimony about this as well as the exhibit, you have to satisfy the Air Force that you are discharging the things that they wanted you to do in a manner to their satisfaction. And so if you look at this agreement in the same way as the application of Roswell agreement was looked at by the Supreme Court in the Millennium case, that would mean that about 95.5% of the revenues are being considered rent if you consider this to be a lease. And in fact, the fact that you get 5.5% or 4.5% of the revenues as a management fee is indicative of the fact that the intent of the parties was to create a license for a 50-year term. If you look at the rental that Scott Air Force Base LLC paid, we paid $1 for a 50-year period. So you can say that that dollar is the rent that satisfies the requirement for a lease, but it's really nominal rent in the ALJ described as that. So if you use the application of Roswell analysis, as the Illinois Supreme Court did, it's very clear from the revenues that this was a license. If you look at the Stevens case, which was the other case that they set out as a marker, there the rent that was paid by McDonald's was $30,000 a year plus 6% of gross sales over $500,000. And the difference there was that McDonald's actually kept the money and then made a payment to the college. It had control of the money, and it had control over the premises that had been given to establish the restaurant. And the Supreme Court in Millennium found that these two are appropriate markers to look at to determine the difference between a license and a lease, and concluded there, as we argued here, that the agreement here is much closer to Roswell than it is to Stevens. The county will tell you that if you look at the agreements, and the ALJ discusses the welfare, our client agreed to pay taxes. And it's true that the agreement says that Scott LLC is responsible for taking up taxes, but it also says that Scott LLC can seek an exemption, or seek an abatement, or can challenge the taxes. And if you look at when the agreement was negotiated, obviously it was before this was all constructed or renovated. And it was before we had any idea what St. Clair County was going to do with respect to taxes. So, as was lawyers on all sides, representative parties, they covered every eventuality. In the event that Scott, that St. Clair County imposes taxes, you're going to be responsible for them. In the event they do, we also give you the right to assert exemptions that are available to you. So, the fact that that is in the agreement does not mean that those in agreement with St. Clair County don't pay the taxes. It was really protecting that eventuality. But the more, probably the more appropriate question is, why would St. Clair County think that it had a justification to impose the taxes when the Air Force, as Scott LLC knew these facts, they knew that the police protection would be provided by the Air Force, not by the St. Clair County. The fire protection would be provided by the Air Force, not St. Clair County. The utilities would be provided by the Air Force, not St. Clair County. Waste disposal, everything that is provided to a developer outside of the confines of Scott Air Force Base was being provided by the Air Force. So, what justification did St. Clair County have to impose taxes for which it was rendering no services? And so, even though our client may have agreed to the eventuality that they would be responsible if taxes were imposed, it was probably a very realistic imputation that taxes really shouldn't be imposed in this case. If you turn to the exclusive possession of the premises, move away from the financial ability of possession of the premises, let's look to the Act of Congress that authorized this agreement. The Act of Congress was the Military Housing Privatization Initiative. The problem that Congress was addressing was the fact that there was not enough appropriation money to build the housing, to renovate the housing, to clean up, and it was creating a morale problem, a retention and recruitment problem. The problem was not that there wasn't enough control of military commanders over their bases. And so, Congress did not intend to diminish the control of military commanders over the bases. One, Iowa. The only problem it wanted to address was providing them private financing with the expertise of private developers that could ramp this up much more quickly and get the housing built that was needed to be built for national security purposes. So, you'll see a number of cases that have been cited by the county, by us as well, about garages and restaurants at colleges and concessions at airports, and even about hunting privileges. But there's not a single case that's been cited to you by the county that is about somebody who was conducting an activity on their property, and then the next day enters into an agreement to have somebody else conduct that exact same activity in the way that it was conducting it before and to its standards. This is always in the case of a college. A college was not running a McDonald's restaurant. It was having McDonald's come in and start a McDonald's restaurant to run it. For the parking facility, the city was not running a parking facility. It was asking somebody to come in and build it and run it. Here, the Air Force had a longstanding record of building and running the facility, and it needed to have that facility run the same way that it expected it to. Because not all military facilities are going to be under privatization. Some of them will not be privatized yet, and others will remain under government control. So, in terms of control, a military commander, and we have testimony that the base commander at these bases are rotated every two years, has to move from base to base and know the same amount of control applies at that base regardless of whether it's a private developer that built the housing and manages it or whether it's the Air Force. Military families that move all the time from base to base have to know that what they expect in one base that is owned and run by the government is going to be the same when they move to a base that is operated by a private company. And so the expectation, when they enter into this agreement, the very first paragraph of it says the Air Force entering the facility to the authority of this act. The only intent they had was to provide financing and not in any way to diminish the control of the base commander over the property. Now, the county tries to distinguish that by saying that, well, a lot of those requirements that we have emphasized about who has access to the base and who can be thrown off the base and the fact that agencies can come in, the U.S. government can come in at any time to the premises and inspect our records and everything else, they say that those are all issues that would relate to national security that you should expect. But the Department of Revenue looked at that and said there's things in this agreement that go way beyond national security, so it's not about this national security being not involved in military housing. The, for example, they controlled the, we have testimony about not being able to trim the trees within sight of a general's window because if they did, then you have to go out and get permission from that general or from the base commander to trim those trees. If it's anywhere close to the entrance, you have to get permission to trim the trees. If you, if we have testimony about an employee of LFC who was allowed to live on the base but couldn't get his mother on the base for two months, it took that long to get a procedure where she would be allowed to come on the base. If it was an air conditioning requirement that was coming in, something that we're familiar with in the last couple of days, then that was perfectly okay. They could bring him in through the regular security process, but his mother had no role there related to the Air Force, and it took two months to get a procedure to do that. So what the ALJ concluded was the control that the Air Force has goes way beyond just the need for national security, and that is indicative of a lease. In Millennium Park, one of the things the Supreme Court said that is, that has been repeated since the very first times that the courts have dealt with this issue was that one of the exclusive possession of the premises against all the world, including the owner. If that's the case, then it's a lease. But if it merely confers the privilege to occupy the premises under the owner, it is a license. And the ALJ concluded properly that Scott LLC does not have exclusive possession against the United States Air Force. It can be thrown off the base. It can have restrictions on who it hires, on who it rents to, on what kind of rental agreement it can have, what the terms of it are. There's testimony given that they regulate the Air Force specified, the size and weight of pets that can be had, whereas it's the same manager that testified in another facility, which is not owned by the Air Force, that is private. They could set their restriction on that. In this case, the Air Force set their restriction on the size of pets and so forth. So the control is way beyond national security. And with regard to clear error, which is the burden that the county has to have, it is hard to take this as an aberration, the conclusion that the Air Force had so much control that it never really surrendered any type of ownership. Because we have several cases. We have one in the federal district court in North Carolina that a senior federal judge looked at a similar project at Camp Lejeune and concluded that the military jurisdiction, the government's jurisdiction, was not diminished one iota because the government had obtained such exclusive jurisdiction that its ownership was undiminished. And there was a ground lease involved there as well. And so the price conclusion is not an outlier. There was another decision from a lower body, a county board in Utah. But the issue there was also whether or not property improvements that had been quick claimed to the developer by the military were in the possession, in the ownership of the developer or in the ownership of the United States. Because in one case it would be taxable if they were in the ownership of the developer and not taxable if they were in ownership of the United States. And even though there was a quick claim, the conclusion was with findings of fact that the government had not surrendered possession and control over the assets such that it remained the owner. That is not an aberrant conclusion even under Illinois law because there is cases in exemption called the Cold Hospital case where the Illinois courts have said that if you have a charitable organization that owns property and is conducting a charitable activity on it, if for purposes of financing it has to sell the property and lease it back, the courts have held that it still is the owner of that property because it has all the control and benefits of the property just as it did when it held title to it. And what you have here is really the mirror of that except that the county is saying that the United States government does not have the same privileges Illinois organizations do of seeking financing and making arrangements for that. And in the case of Cott Air Force Base, it still owns the underlying land and it has retained such exclusive possession and control, even though it had a document called a lease, that it has not diminished its possession and control and has not given a property interest that could be subject to tax. And that's the key here. There is no property interest for the property tax bill to apply to. One of the burdens that the county said we had to meet was that we had to meet the strict scrutiny burden that is applicable to exemptions, except there's no exemption being applied here. The finding was that this is not property. And until you have property, you don't apply the strict scrutiny test for an exemption. So this was just a preponderance of the evidence evidentiary burden, and then as far as the standard review goes, they have to leave you the impression that a clear error was made by the department and a clear error was not made by the department. In this case, that can be contested from Roosevelt and from the cases from the other jurisdictions. I'll stop there and leave my time. Thank you. Thank you, counsel. Oh, I'm sorry. No, I didn't. Counsel? Good afternoon. May it please the Court. My name is Ellen Berkshire, I'm a Special Assistant State's Attorney on behalf of St. Clair County. The issue is whether the lease executed between Scott Air Force Base Properties, LLC, a for-profit company, and the United States government creates a taxable leasehold interest. The administrative law judge in the underlying recommendation to the Department of Revenue was clearly erroneous in determining that the interest created was a mere license for several reasons. First, intent. The parties clearly intended to create a lease and leasehold interest in this matter. Secondly, use. The LLC's use of this property is not an exempt use. It is for the design, development, renovation, demolition, construction, operation, and management of privatized military housing. Third, the LLC does retain the necessary possession and control over the leasehold improvements themselves. The LLC wants to confuse the leasehold improvements with the underlying land and the government's interest in the property. Yes, the government has an interest in protecting the safety and welfare of the installation itself, but a careful reading of the lease and the documents also indicates that they understood that they needed to protect the interest of the LLC in the leasehold improvements themselves. And lastly, we have an issue of uniformity that was not really addressed by the LLC, and that is that we have the legislature determining that PPV leases in Illinois are taxable interests. Now, first with the issue of intent. It's indisputable in this case that the ALJ was clearly erroneous in determining that there was some sort of intent to create a license. The language in the documents, well, first of all, the document itself is drafted as a lease. All of the language in this document refers to the document as a lease and the interest as a leasehold interest. In fact, there are 270 references in the record and in the documents that refer to the lease as a lease and the interest as a leasehold interest. There is not a single reference to this as a license. The language in the documents is plain, it's clear, and it's unambiguous. Also, there is a relationship that has been defined between the parties in the documents, and that is found in Condition 24.5 of the lease where the parties state that it is understood and agreed that the only relationship between the government and the lessee under this lease is that of a landlord and tenant. The First District Court in Jewelers Mutual Insurance Company v. First Star Bank of Illinois found that a presumption of intent to create a lease where the parties define themselves as a tenant and a landlord. We also have the goal of the request for proposal before this project was even awarded, and the goal of that project states that it is to transfer an ownership interest in the housing development to a private entity with the expertise and experience and financial ability to plan and execute the required military housing. It's also important to remember, as pointed out by the circuit court judge, these were sophisticated and knowledgeable parties. Mr. Bond, who testified on behalf of the LLC, admitted under direct examination that he holds a leasehold interest. He also testified that what he received in this project was a leasehold. And finally, we have the custom in Illinois, which I'll get into more detail later, but the custom is that in Illinois, PPV leases create taxable leasehold interests. There was no need for the administrative law judge here to try to read into the agreements. They're clear, they're unambiguous, and the intent was to create a lease and a leasehold interest. Turning then to the issue of use, the LLC's use of the property is not an exempt use, and they can't point to any statute in Illinois that does give them an exemption. Leasehold interests on exempt property not otherwise in exempt ownership or use are taxable. Mr. Bond, again on behalf of the LLC, testified that there are three opportunities for income on behalf of this project. There's the design-build phase, there's the development agreement or development contract, and there's also the property management agreement. So there's multiple benefits that accrue from the LLC entering into these agreements with the government. They get the exclusive right to manage the contract, award maintenance contracts, award development contracts, award management contracts, and operate the housing itself. The government has no right to interfere with those particular interests. Turning then to the issue of possession and control, yes, there are some restrictions on the property. However, these parties understood those restrictions when they entered into these agreements and still did not draft anything into the agreement to be anything other than a lease or leasehold interest. And anyway, mere restrictions on property do not destroy the bundle of rights created by the transfer of the property as held in People v. Chicago, MetroPAR, and Metropolitan Airport Authority of Rock Island. The restrictions on this property are very clearly limited to the safety and welfare of the installation. And that is very well illustrated by Condition 27.1 of the lease that states, Nothing in this lease shall be construed to diminish, limit, or restrict any right of the lessee under this lease or the rights of tenants as prescribed under the tenant leases or applicable laws. The government was very careful in including language that protected the LLC's interest in this property. And the LLC understood there would be some restrictions on the property. Every single condition that is cited in the lease to state that it's a restriction that takes away exclusive possession and control is followed by a clause that states that it's only for the welfare and safety of the installation. The interests of the LLC in holding the ownership interest of the leasehold itself are not under the control or possession of the government. Then we have the issue of uniformity, which is an important issue here because the Illinois legislature has the plenary authority to tax. The Illinois legislature had previously determined in the property tax code and defined a PPV lease as a taxable leasehold interest. 35 ILCS 210-370, which has subsequently been amended, but prior to its amendment read, a leasehold interest in property that is exempt from taxation under Section 1550 of this code and that is leased pursuant to authority set forth in Chapter 10 of the United States Code to another whose property is not exempt for the purpose of, after January 1, 2006, the design, finance, construction, renovation, management, operation, and maintenance of rental housing units and associated improvements at naval training and related naval support facilities in the state of Illinois. True, the statute is strictly saying that it's for naval facilities, but the ALJ in this case doesn't have the right to usurp the legislature into its determination that a PPV lease itself is a taxable interest. And it's also important to note that the language that I just read from the Illinois statute is identical to the language that's contained in the lease and other documents in our case. It violates the principles of uniformity not to tax the leasehold interest at Scott Air Force Base while the same type of PPV lease in Great Lakes Naval Base is taxed. There are facts to support the fact that the lease at Scott Air Force Base is not significantly different from the lease at Great Lakes. Mr. Vaughn, on behalf of the LLC, stated that this RFP project, referring to Scott Air Force Base, looks like every other RFP. He also testified that he was aware of the project up north, the Great Lakes, and he presented a proposal to become a project owner of that project. He was also aware of the legislation when it was proposed and passed. And finally, most importantly, Mr. Vaughn testified that the lease was done under a similar set of authorities and a similar set of documents. Therefore, there's nothing to distinguish the PPV lease that is taxed in Great Lakes versus the PPV lease at Scott Air Force Base. Is that Great Lakes case a Supreme Court or First District? What is it? I'm sorry. I didn't hear the question. What? Is that a First District appellate case or a Supreme Court case, Illinois Supreme? The Great Lakes. Oh, the Great Lakes is the Naval Base up north. I know that, but is it the First District or is it Supreme Court? Who decided? There is no case. There's not a case I'm referring to. Oh, I thought you were. I'm comparing the Great Lakes Naval Base lease with the lease here, the fact that it is taxed, and the ALG is trying to say that this one should not be taxed. I was trying to find a precedent. I couldn't find it. But there is legislation passed, 35 ILCS 200, 10-370, and the legislature has subsequently clarified its intent in passing that legislation, and they amended the tax code, Section 10-370 and 10-80, and this was after the ALG had made its ruling, but they mandated then that all interests enjoyed pursuant to the authorities set forth in Chapter 150 and Chapter 169 of Title 10 of the United States Code are considered leaseholds. What more clarification could we get? Are there any other questions before I conclude? I don't believe so. Go ahead. No? Okay. I just want to conclude that the Circuit Court judge's decision should be upheld in reversing the administrative law judge's determination that the interest created here was a mere license and not a leasehold because of the intent, the use of the property, the possession and control, and the issue of uniformity. Thank you very much for your time. Thank you, counsel. Counsel? Thank you, Madam. Respect to uniformity. The ALJ actually discusses this in his decision, so it was not an issue that was ignored by the Department of Revenue. And the claim, as Ms. Berkshire just told you, the statute, 10-370 of the Property Tax Code, applied to a public-private lease, as defined in that statute, in a naval facility. So at the time we held this hearing, there was, you know, clearly this was not a naval facility we were dealing with, and there was legislative history that was introduced and was reviewed by the ALJ, where he concluded that the General Assembly knew about it, but basically decided not to include that in the statute. So what they were asking the ALJ to do was to extend the statute strictly applicable to naval facilities to a facility that the legislature chose to leave out of the statute. That's not a violation of uniformity. That's following the General Assembly statute. Now, Mr. Vaughn, who's our witness on cross-examination, was asked about the naval facility, but the ALJ noted that if the uniformity argument was being advanced by the county, the county never introduced any of the agreements, any of the documentation, with regard to the Great Lakes Naval Facility housing. So they're trying to get from Mr. Vaughn's set of cross-examination responses as somehow being represented on the agreements. We haven't seen the agreements. The ALJ did not see the agreements, and for that reason said he couldn't really evaluate whether one taxpayer was being treated differently than another. The main difference being that he was concluding that under this agreement, Scott LLC did not have any property. It should not be a taxpayer under the property tax code, and he couldn't tell that with regard to the naval facility. Now, the clarification that was passed was passed after the administrative hearing, which the trial was held in January of 2010. The decision of the department issued in mid-2011. The lower court decision was issued in November. The legislation was passed in August. By August, Ms. Berkshire and I had already argued this case before the judge. We had already briefed him. There was nothing in the record about the clarifications of not having an application to what the department did. In any event, we noted in our brief, we have since filed a suit in St. Clair County challenging the constitutionality of that amendment. So that's already being determined, and it's not before the court on administrative review. On administrative review, the court below, as this court, is limited by the record of the issues presented in the record both factually and legally, and that was not before the court, and it's not before this court. The restrictions have been unfairly minimized by Ms. Berkshire. The conditions go even to naming restrictions. Scott LLC could not name any facility without getting approval from the government. It couldn't change the management of the operation without consulting and getting approval from the government. The designs of everything had to be approved by the government, including just the admission and approval of the subcontractors that it gets. So the requirements for control were no less on January 2nd of 2006 when this agreement went into effect than they were on December 30th of 2005 when the Air Force controlled the housing entirely. And it makes perfect sense that if an agreement is being entered pursuant to the Military Housing Privatization Initiative Act, and it says so in the agreement, that the intent of the Air Force when signing that agreement was not to diminish the control at the date before it signed it. So this is housing within Scott Air Force Base, and the testimony was this is an enclave. It's a military base. It's got guards. It's got all types of security that is enforced. It pervades the entire area. So the restrictions are significant and go beyond just what pertains to national security. The – I return again to the fact that you had to leave it with a clear impression that there was an error made below. There was a mistake made. And I did not hear any of the cases – the Tynan-Vermeen case from the federal district court not being distinguished in any way. Did not hear the case in Utah being distinguished in any way. Or even the exemption case. There is no requirement of use for the government's exemption. The government's exemption is only that it owned the property. When we filed the application, and this is in the record, the application we filed said what exemption are you claiming? We put in the government's exemption, which is that it was owned by the government, which is entirely consistent with the conclusion the department reached, which was that in the agreement to us, the government had not diminished its ownership at all. And that's why we cited the exemption case on Cole Hospital, because if you're going to say to an Illinois-exempt organization  that you can sell it and lease it back and still be considered the owner, you have to look at the government and say that the federal government has the same right to be considered the owner when it still holds the land and gives a lease for its own purposes. And we can call it a lease, and I'm going to use that term as I did at the hearing, because the whole point of the case law for the last three years is that you don't go by the terminology, you go by the effect. And the effect is that we were – You can finish it. We were on the base of the commission of the Air Force to do what the Air Force did, and we only get paid if we pass the license. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take this case under advisory. Thank you.